## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GENE RAYMOND BELL,

       *Plaintiff*,

    v.

OFFICER ANTHONIE KORKIS,
OFFICER ARTHUR BRIDGEFORTH, and
OFFICER THOMAS LANGEWICZ, II,
Jointly and severally and in their
Individual capacities,

       *Defendants*.

_____/

Case No. 2:19-cv-13565

District Judge
Gershwin A. Drain

## ORDER DENYING DEFENDANTS'
## <u>MOTION FOR SUMMARY JUDGMENT [#77]</u>

This matter is before the Court on a Motion for Summary Judgment filed by Defendant police officers Anthonie Korkis, Arthur Bridgeforth, and Thomas Langewicz, II ("Defendants"). ECF No. 77. Upon review of the parties' submissions, the Court finds that oral argument will not aid in the disposition of this matter. Accordingly, the Court will resolve Defendants' Motion on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons stated herein, Defendants' Motion for Summary Judgment will be denied.

## I.      BACKGROUND

Gene Raymond Bell ("Plaintiff") is a pro se litigant receiving limited assistance from a law-school-based pro se legal assistance clinic. He is a Black male who was 61 years old at the time of these events. ECF No. 88, PageID.1076. Below is an account of the facts as outlined in his Amended Complaint and a separate account as observed in video evidence of the event. Plaintiff's claims are largely consistent with the available footage, though the videos offer significantly more detail. The Court will rely primarily on the footage when assessing the facts and will construe facts not depicted in the light most favorable to Plaintiff, the nonmoving party. *Ashford v. Raby*, 951 F.3d 798, 800 (6th Cir. 2020).

### A.      Plaintiff's Allegations

On June 23, 2019, Plaintiff was driving a 2003 Chevrolet Trailblazer though the City of Southfield, Michigan. ECF No. 21, PageID.239. While on routine patrol, Defendant Officer Korkis spotted Plaintiff's vehicle and conducted a random license plate verification. *Id.* The verification reported "NO RECORD" of the license plate number in the Secretary of State's database, which prompted the officer to initiate a traffic stop. *Id.* Once Plaintiff was stopped, he asked why he was being pulled over. *Id.* at PageID.240. Officer Korkis responded that he would tell Plaintiff the reason for the stop after the requested documents were produced. *Id*. He then told Plaintiff that four additional patrol cars would soon arrive to the scene, at which time Plaintiff

would be pulled out of his car and arrested for resisting and obstruction. *Id*.

Plaintiff stated to Officer Korkis that if he were to be placed under arrest, he would exit the vehicle on his own. *Id.* Officer Korkis responded, "we're going to do it our way," before reaching into Plaintiff's car window. *Id.* Officer Korkis and his backup then began to forcefully remove Plaintiff from his truck. *Id.* As this went on, Officer Korkis yelled, "Boy! I'll break your fucking hand." *Id.* When Plaintiff again stated that he would exit the vehicle, Officer Korkis repeated that Plaintiff was getting out "our way." *Id.* The officers then forcefully removed Plaintiff from his truck and forced him to the ground, causing injury. *Id.*

### B.    The Videos

 Submitted as exhibits are dashcam videos taken from each Defendant officer's vehicle. The footage taken from Officer Korkis's dashcam is the most fulsome, so the account below will be mostly drawn from there, with supplement from the other videos and exhibits as necessary.

As the video begins, Officer Korkis is driving patrol when he pulls behind Plaintiff's Chevy Trailblazer at a red light. ECF No. 77-2, (0:15). He asserts that he entered Plaintiff's license plate number in the Secretary of State's database and found "NO RECORD," meaning the truck may be unregistered. ECF No. 77-5, PageID.931. Officer Korkis then turned on his emergency lights to initiate a traffic stop. *Id.* It is not clear from the video when the emergency lights were activated, but

video shows that once the traffic light turned green, Plaintiff drove past multiple parking lot entries before pulling to the side of a two-lane road with no shoulder. ECF No. 77-2, (1:11). The dashcam's audio activates at this point, and Officer Korkis can be heard instructing Plaintiff to "pull into the next driveway on your right." *Id.* at (1:13). Plaintiff then pulls into the next lot, situating his car partially in a parking spot, and Officer Korkis pulls behind him. *Id.* at (1:39).

Once he approaches the driver's side window, Officer Korkis identifies himself with the Southfield Police Department and asks Plaintiff for his license, registration, and insurance. *Id.* at (2:00–2:06). Plaintiff's response is not clear, but Officer Korkis repeats twice more his request for documents. Plaintiff can be heard saying, "what did I do wrong?" *Id.* at (2:06–2:11). Officer Korkis informs Plaintiff that he will explain the reason for the stop once Plaintiff provides his documents. *Id.* at (2:12–2:13). Plaintiff does not comply.

As his initial appeals are unsuccessful, Officer Korkis requests assistance via radio, stating that he is dealing with an uncooperative driver. *Id.* at (2:16). Officer Korkis then asks Plaintiff for his identification several more times, and Plaintiff repeatedly asserts that he does not have to provide it without being told why he was pulled over. *Id.* at (2:16–2:36). Officer Korkis tells Plaintiff that if he does not provide his identification, he will be arrested for resisting and obstruction. *Id.* at (2:36–2:39). Plaintiff asserts that he is not resisting, Officer Korkis requests the

4

documents again, and this argument continues for the next minute—with Officer Korkis eventually telling Plaintiff that four additional units were arriving and that he would be pulled out of the car and arrested. *Id.* at (2:40–3:31).

Without prompting, Plaintiff asks whether Officer Korkis wants him to "pull into a spot; turn my car off?" *Id.* at (3:32–3:34). He then asserts that he will pull into a spot and get out of his car as the vehicle's taillights illuminate. *Id.* at (3:34–3:38). Officer Korkis instructs, "No, you're not. Do not put this car in drive." *Id.* (3:39–3:40). Plaintiff again states that he will move to a nearby spot, and Officer Korkis repeats several times, "No, you are not" before the taillights go dim. *Id.* (3:41–3:45). He then appears to wave in a car off screen as backup arrives. *Id.*

Shortly after, Defendant Officer Bridgeforth arrives and approaches the passenger side window. *Id.* at (3:54). Defendant Officer Langewicz pulls his vehicle in front of Plaintiff's truck to "block him in" as instructed by Officer Korkis, and Plaintiff states twice, "I'm not going anywhere." *Id.* at (3:54–4:04). At this time, Officer Langewicz exits his vehicle and stands several feet away from Officer Korkis and the driver's side window. The argument between Plaintiff and Officer Korkis resumes before Officer Bridgeforth interjects, telling Plaintiff that he would be told why he was pulled over after he identified himself. ECF No. 77–4, (1:26–1:45). Again, Plaintiff did not comply.

Officer Korkis then says, "Sir, okay I'm going to ask you one more time, and

I'm going to place you under arrest for resisting an obstruction." ECF No. 77–2, (4:44–4:47). He then repeats, "This is going to be the last time I'm going to ask you: are you willing to provide me with your registration, insurance, and your driver's license?" *Id.* at (4:49–4:55). Plaintiff repeats in response, "Not until you tell me what I did wrong." *Id.* The argument resumes, and Officer Langewicz approaches the driver's side window. *Id.* at (4:55–5:00). Plaintiff can be heard repeating, "What do you mean you don't have to tell me? What do you mean you don't have to tell me?" *Id.* at (5:00–5:05).

Officer Bridgforth then says, "We can do this the easy way or the hard way." ECF No. 77-4, (2:15–2:22). He tells Plaintiff that if he doesn't comply, he "will be arrested right now." *Id.* at (2:22–2:24). To this, Plaintiff tells Officer Bridgeforth, "[Inaudible] . . . I'll take my seatbelt off, and I'll get out of my car myself." Korkis then cuts in and says, "We're going to do it our way because you'll be placed under arrest for resisting and obstruction." ECF No. 77–2 (5:16–5:20).

Thought not fully visible from any of the three available videos, Korkis can then be seen reaching into the driver's side window. ECF No. 77-4, (2:29). It is not clear who initiates physical contact inside the car, but Plaintiff and Officer Korkis soon begin struggling as Officer Korkis grabs some part of Plaintiff's arm or wrist through the window. *Id.* at (2:31). As the two men are struggling, Officer Langewicz trains a taser at Plaintiff, and Officer Korkis says, "Boy, I will break your fucking

hand." ECF No. 77–2, (5:23–5:28). Plaintiff responded, "What did you call me?" as Officer Korkis partially repeats, "I will break your fucking hand." *Id.* Plaintiff can be heard yelling, "Did you call me 'boy'? Did you call me 'boy'?" as Officer Langewicz yells "Fuck around and you're going to get tased!" *Id.* at (5:28–5:31).[1]

In the struggle, Officer Korkis yells, "Don't do it! Don't do it!" *Id.* at (5:29–5:34). And Plaintiff again volunteers, "Sir, I'm getting out." *Id.* at (5:32–5:33). Officer Korkis again declines and says, "No you're not, you're getting out our way now." *Id.* at (5:34–5:36). Defendants pry the door open shortly after, and Officer Bridgeforth rushes to the driver's side of the vehicle to help pull Plaintiff from his seat. *Id.* at (5:39–5:41). As Defendants are pulling Plaintiff from his seat, one of the officers says, "Get on the ground. Get on the fucking ground." At the same time, Plaintiff refused and said, "I'm not getting on the ground," at which point he was forced to the ground by the three officers. *Id.* at (5:42–5:47).

---

[1]Plaintiff was understandably offended by being referred to as "boy" by Officer Korkis, a white man. It is well understood that the word "boy" is a long-standing racial slur traditionally used by white people to demean and belittle adult black men. *Hernandez v. Communs. Unlimited of the S., Inc.*, No. 3:03cv0760-T, 2005 U.S. Dist. LEXIS 40673, at *19 (M.D. Ala. Feb. 22, 2005) ("the word 'boy' can be . . . as the history of this country regrettably teaches, racially offensive and even explosive if said in a derisive and humiliating manner by a white person to a black adult male."); *Sosa v. Medstaff, Inc.*, 2014 U.S. Dist. LEXIS 123976, at *13 (S.D.N.Y. Sep. 3, 2014) (quoting *Hernandez*); *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456, 126 S. Ct. 1195, 1197 (2006) (recognizing that the use of "boy" to refer to black man could itself be evidence of racial animus).

The Court recognizes that Plaintiff, at 61 years old, was in no sense a "boy."

\*\*\*

Plaintiff filed his Amended Complaint under 42 U.S.C. § 1983 on November 11, 2020. ECF No. 21. He alleges that Defendants violated his Fourth and Fourteenth Amendment Rights by using excessive force when they "forcefully removed Plaintiff from the car and violently threw him to the ground." ECF No. 21, PageID.240. [2] Defendants claim the protection of qualified immunity, arguing that "the entire encounter is entitled to qualified immunity because Plaintiff resisted every effort of the Officers up to and during his removal from the vehicle." ECF No. 77, PageID.907. Though Defendants unsuccessfully claimed qualified immunity on this issue at the pleading stage, they argue that facts revealed during discovery now show that litigation should end here.

## II.    LEGAL STANDARD

A district court should grant summary judgment when "a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Simms v. Bayer Heathcare LLC (In re Bayer Heathcare)*, 752 F.3d 1065, 1075 (6th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed.

---

[2]Plaintiff also claimed that the officers used excessive force in tasing him while he was on the ground to effectuate the arrest. ECF No. 21, PageID.241. The Sixth Circuit reversed this Court's denial of qualified immunity on that claim. *Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022).

2d 265 (1986)). Thus, summary judgment is appropriate when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (a). In ruling on a motion for summary judgment, a district court must consider the whole record and "view all evidence in the light most favorable to the nonmoving party." *Tennial v. UPS*, 840 F.3d 292, 301 (6th Cir. 2016).

Where, as here, there is video evidence of the events underlying Plaintiff's allegations, a court views the facts as depicted in the video. *Francis v. Huff*, No. 22-5282, 2022 U.S. App. LEXIS 28595, at *5 (6th Cir. Oct. 14, 2022). "If the facts can be interpreted in multiple ways, or if the video does not show all relevant facts, we construe any relevant uncertainties or gaps in the light most favorable to the non-moving party." *Id.*

### III.   ANALYSIS

Qualified immunity protects government officials in the performance of discretionary functions from civil litigation "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rieves v. Town of Smyrna*, 959 F.3d 678, 695 (6th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "Clearly established means that the law is so clear at the time of the incident that every reasonable officer would understand the unlawfulness of his

conduct." *Howse v. Hodous*, 953 F.3d 402, 407 (6th Cir. 2020) (cleaned up). This doctrine is especially important in cases of alleged police misconduct, as officers are often required to make split-second decisions under significant pressure. Thus, "we view officers' actions from the perspective of a reasonable officer in the particular situation that officer confronted." *Bell*, 37 F.4th at 367.

Once qualified immunity has been raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *Richards v. Cty. of Washtenaw*, 818 F. App'x 487, 490 (6th Cir. 2020). Though it is often appropriate to assess the qualified immunity factors in the above order, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009). As such, the Court will first assess the clearly established law on excessive force at the time of the incident. Then the Court will discuss whether Defendants have established that they did not use excessive force in violation of the Fourth Amendment.

### A.    It Was Clearly Established on June 23, 2019 That Force May Only Be Used to Subdue Someone Who Is Actively Resisting Arrest.

Defendants argue that they did not violate precedent because courts have previously assessed vehicle removals "based on the conduct leading up to the removal and takedown." ECF No. 77, PageID.922. They cite several cases for the

proposition that officers may immediately resort to force when removing a driver from their vehicle if the driver has previously resisted commands. *Id.* at PageID.923 (citing *Dunn v. Matatall,* 549 F.3d 348 (6th Cir. 2008); *Ryan v. Hazel Park*, 279 F. App'x 335 (6th Cir. 2008)). Alternatively, they assert that clearly established precedent permitted the use of force even if Plaintiff was not resisting at the time. *Id.* at PageID.922–923 (citing *Fox v. DeSoto*, 489 F.3d 227 (6th Cir. 2007); *Bozung v. Rawson*, 439 F. App'x 513 (6th Cir. 2011)). They argue that it is constitutionally permissible for officers to forcefully take an individual to the ground even when they are compliant, non-violent, or non-threatening. *Id.* at PageID.923.

This is not the law. The Sixth Circuit has made clear that police officers cannot use force to arrest a compliant, non-resisting individual, even if that individual was non-compliant earlier in the interaction. The appellate court held in *Rudlaff v. Gillispie* that "when a suspect actively resists arrest, the police can use [force] to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot. 791 F.3d 638, 642 (6th Cir. 2015) (cited with approval in *Carter v. Carter*, 728 F. App'x 419, 423 (6th Cir. 2018)). "Actively resisting" contemplates an individual who is "physically struggling with, threatening, or disobeying officers" and not someone who has ceased these actions. *Rudlaff*, 791 F.3d at 641 (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)).

The ruling in *Eldridge v. City of Warren*, 533 F. App'x 529 (6th Cir. 2013)

11

illustrates this principle as applied to non-compliant drivers in traffic stops. There, officers were dispatched to a car that had plowed into construction barricades after driving erratically through multiple patches of grass. *Id.* at 530. An officer approached the driver's side window and found the driver largely unresponsive to several questions and commands. *Id.* When repeatedly ordered to step out of the vehicle, the barely responsive driver said softly, "I'm fine." *Id.* When threatened with tasing and being pulled out of the vehicle, the driver muttered, "I'm fine" again. *Id.* at 531. The officers then tased the driver, pulled him out of his vehicle, and pinned him to the side of the car. *Id.* When he was too slow to get to the ground after being ordered to do so, he was forced down and consequently injured. *Id.* Only after this incident did officers realize that the driver was experiencing a diabetes-related medical emergency. *Id.*

The Sixth Circuit affirmed the district court's decision to deny qualified immunity on summary judgment. *Id.* at 536. The court stated plainly that "[i]f there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more." *Id.* at 535. The *Eldridge* court found that, at most, the driver offered passive resistance, which was insufficient to justify a forceful arrest. *Id*. (citing *Coles v. Eagle*, 704 F.3d 624, 629-30 (9th Cir. 2012) ("We have drawn a distinction between passive and active resistance, and failing to exit a vehicle is not active resistance."). The *Eldridge* court

made clear that active resistance requires "a verbal showing of hostility . . . a deliberate act of defiance using one's own body . . . or some other mechanism." *Eldridge*, 533 F. App'x 529 at 535.

The cases cited by Defendants further illustrate this finding. In *Dunn*, for example, a driver was pulled over after leading an officer on a brief car chase. *Dunn*, 549 F.3d at 351. The driver then complied with the officer's instruction to drop the keys through the car window and to unlock the car door. *Id.* The officer opened the door and attempted to remove the driver from the car, but there was a struggle because he had not removed his seatbelt. *Id.* A second officer arrived at this moment and perceived that the driver was resisting an arrest. *Id.* The officer perceived resistance even though the driver verbally indicated that he was trying to comply. *Id.* The officers continued to forcefully pull him from the vehicle until he was eventually removed and injured in the scuffle. *Id.*

Contrary to Defendants' assertion, the *Dunn* court did not categorically "find it reasonable to immediately use force to remove a driver after a pursuit and commands to exit." ECF No. 77, PageID.923. Rather, the court found that force was permissible because it found that the officers reasonably thought the plaintiff was actively resisting arrest. *Dunn*, 549 F.3d at 354–355. The court stated that even though the plaintiff may have indicated that he would exit his vehicle on his own, "only seconds elapsed between the time the seatbelt was unfastened and when Dunn

13

was pulled out of the car, giving officers little opportunity to fully comprehend whether Dunn had finally decided to become compliant." *Id*.

Similarly, the *Ryan* court found that officers were justified in using force in an arrest following a traffic stop because the driver actively resisted the officer's attempt to arrest her. She "refused to follow the officer's directions to display her hands and exit her vehicle," meaning the officer "had to forcibly remove Ryan from the vehicle." 279 F. App'x at 338. *Bozung* is the same, as the Sixth Circuit found force permissible because the plaintiff actively resisted by disobeying an order to put his hands behind his back, despite having "a sufficient amount of time . . . to comply with the officer's request . . ." 439 F. App'x at 521.[3]

In sum, at the time of Plaintiff's encounter with Defendants, a reasonable officer would know that he/she may only use force to arrest an individual who is reasonably believed to be actively resisting arrest. *Eldridge*, 533 F. App'x at 535 (a person has a "clearly-established right . . . to be free from the use of physical force when he is not resisting police efforts to apprehend him."). If an individual is compliant, their prior resistance does not grant officers an irrevocable license to subdue him/her with force.[4]

---

[3]The *Fox* case cited by Defendants offers no guidance, as the officers there used force to arrest an armed and disorderly individual on a boarded commercial flight. 489 F.3d at 231-232.

[4]Defendants argue that this case should be dismissed because "Plaintiff has failed to carry his burden as to [the clearly established] prong of the qualified immunity

**B. There is a Genuine Issue of Fact as to Whether Defendants Used Excessive Force When Arresting Plaintiff.**

If a forceful arrest was permissible to some extent, the parties disagree on whether Plaintiff's forceful removal from his vehicle and subsequent takedown were reasonable. The parties agree, however, that the answer to this question is controlled by the Supreme Court's ruling in *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989). In *Graham*, the Court ruled that the Fourth Amendment permits an officer to use some amount of force to effectuate an arrest. Determining whether that force is reasonable "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Having considered these three factors, the Court finds that Defendants are not entitled to summary judgment because a reasonable jury could find that Defendants'

---

analysis." ECF No. 91, PageID.1174. Defendants are entitled to summary judgment, they argue, because "Plaintiff has not provided any argument as to what *was* clearly established" and "has merely distinguished this case from those cited by Defendants." *Id.* The Court declines to enter summary judgment on this basis because Plaintiff's brief, though lacking, did not neglect the "clearly established" analysis. And a pro se litigant, enjoying limited assistance from a student clinic, should not be denied the opportunity to vindicate a clearly established constitutional right because he narrowly failed to satisfy the nuances of summary judgment briefing.

use of force was excessive. There is a genuine issue of fact as to whether Plaintiff was actively resisting arrest, making force constitutionally permissible, and whether the force used was excessive.

### a. The crime at issue was not severe.

For the first factor, the relevant crime for the severity analysis is the one leading to Plaintiff's forceful arrest—not a crime potentially committed during the altercation. The law is clear that "[c]onduct that is not a violent or [a] serious crime does not permit an officer to use increased force absent other factors." *Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 322 (6th Cir. 2015)).

Plaintiff was pulled over for the non-violent offense of driving an unregistered vehicle. This was not "suggestive of a more violent offense of being a stolen vehicle" as Defendants argue. ECF No. 77, PageID.919. It is too often that otherwise law-abiding individuals balancing the necessities and expenses of daily life find themselves in an unregistered vehicle. For this reason, the fact that a "driver of an automobile cannot produce evidence of its registration does not, standing by itself, provide a basis for a reasonable belief that it is stolen." *People v. 7th Dist. Judge*, 222 N.W.2d 778, 780 (Mich. Ct. App. 1974).

Thus, Defendants are incorrect that "Plaintiff's conduct escalated the initial crime to a violent felony before the officers used physical force to remove him from

the vehicle." ECF No. 77, PageID.920. Video evidence demonstrates that Plaintiff's unlawful conduct prior to his arrest was limited to his non-violent refusal to produce his identification. This crime of obstruction is not severe and is far less problematic than other crimes that are considered non-severe. *Brown v. Chapman*, 814 F.3d 447, 458 (6th Cir. 2016) (driving without headlights on and refusing to provide identification is not severe); *Lyons v. City of Xenia*, 417 F.3d 565, 587 (6th Cir. 2005) (obstructing official business, assault, and resisting arrest are not severe). Thus, this factor weighs toward a finding that the use of force was unreasonable.

### b.  Plaintiff did not pose a significant threat.

The second factor also suggests that the use of force was not objectively reasonable. Defendants argue that Plaintiff posed a threat to the officers and others because he was in a vehicle, had "demonstrated a willingness to put his car in drive," and *could* have access to a weapon. ECF No. 77, PageID.921. However, these considerations are largely applicable to any motorist. If the presence of these details controlled at every traffic stop, the threat analysis would have dubious use in traffic cases. In truth, Plaintiff was not armed, and the officers had no indication that he was. Plaintiff had not threatened violence, had not reached toward Officer Korkis, and had not actually attempted to flee.

There is some merit to the argument that Plaintiff's offer to move his car to a parking spot signaled that he might drive away. But under the totality of the

circumstances, this moment should not have made Plaintiff appear significantly more threatening. At (3:32) in Officer Korkis's dashcam footage, Plaintiff suggests moving his car from the place of the stop to a parking spot, and his taillights illuminate shortly after (3:38). ECF No. 77-2. Plaintiff is told repeatedly not to put his car in drive, and within six seconds of them coming on the taillights go back off. *Id.* at (3:45). It is not clear from the video whether Plaintiff, in fact, puts the car in drive. But it is undisputed that Plaintiff complied with the verbal order not to move his vehicle. Further, there is no discussion on this subject or attempt by Plaintiff to move his car in the two minutes between this proposal and the ultimate altercation. *Id.* at (5:20). Lastly, Korkis mitigates the threat when he instructs Officer Langewicz to park his car in front of Plaintiff's to ensure that it cannot move. *Id.* at (3:57).

Defendants argue elsewhere in the brief that Defendant posed a physical threat because—despite being 61 years of age—he was perceived to be large and physically imposing to the three officers. ECF No. 77, PageID.921. But no reasonable jury could find that one unarmed, non-violent sexagenarian posed a meaningful threat of harm to three trained, armed officers. To be sure, "the Sixth Circuit finds particularly salient whether the plaintiff was outnumbered by police officers." *Hall v. Huffman*, No. 3:14-cv-02532, 2017 U.S. Dist. LEXIS 60370, at *12 (N.D. Ohio Apr. 20, 2017) (citing *Meirthew v. Amore*, 417 F. App'x 494, 497 (6th Cir. 2011); *Harris v. City of Circleville*, 583 F.3d 356, 366 (6th Cir. 2009)).

Though not impossible, Defendants' argument strains credulity.

### c. There is a genuine issue of fact as to whether Plaintiff was actively resisting arrest.

Third, as noted by the Sixth Circuit, it is unclear from the video exhibits whether Plaintiff or Defendant Officer Korkis initiated the physical struggle that resulted in Plaintiff's forceful arrest. *Bell*, 37 F.4th at 366 ("The videos neither blatantly contradict, nor utterly discredit, Bell's contention that Korkis initiated the scuffle."). As discussed below, Defendants have not presented any other evidence showing that Plaintiff actively resisted non-forceful efforts to subdue him.

Defendants argue that Plaintiff "plainly resisted the Officers during the entire encounter, at every step, both verbally and physically." ECF No. 77, PageID.922. They note that prior to the altercation, Plaintiff refused to identify himself for several minutes and that he suggested moving his vehicle from the location of the traffic stop to a parking spot. *Id.* at PageID.922, 923–924. Defendants state that these facts indicate to a reasonable officer that Plaintiff had something to hide and was willing to flee. *Id.* at PageID.923–924. Lastly, Defendants argue that Plaintiff actively resisted arrest by slapping Officer Korkis' hand through the car window, but the Sixth Circuit has already dismissed this argument, ruling that "the videos do not clearly show what happened during this physical struggle through the window," meaning "[i]t's unclear who initiated the physical altercation." *Bell*, 37 F.4th at 366.

For his part, Plaintiff concedes that he resisted orders to provide his

information, but he maintains that he did not actively resist attempts to arrest him. He counters that the altercation ensued because the officers slapped his phone away, an unjustified violent reaction to his attempt to film the interaction. ECF No. 88, PageID.1089. Even accepting that he was non-compliant during the traffic stop, Plaintiff asserts that "that would not justify using force to stop [him from] filming or violently forcing Mr. Bell to the ground." *Id*. He asserts that Defendants overstepped when they "violently forced him to the ground for refusing to provide his license and registration" while Defendant "[was] telling the officers that he was going to exit his vehicle and was not going to fight them." ECF No. 88, PageID.1091.

Construing the facts in favor of the nonmoving party, Defendants have not established that Plaintiff was actively resisting at the time he was forcefully removed from his vehicle and taken down. Evidence shows that after several minutes of passive non-compliance from Plaintiff, Officer Korkis offered him a final opportunity to produce his identification without being arrested. ECF No. 77–2, (4:49–4:55). Plaintiff again refused to produce the documents but asserted that he would voluntarily exit the vehicle. *Id.* at (5:16–5:20). Defendants refused to allow Plaintiff to peacefully submit, as Officer Korkis admittedly replied that Plaintiff was "going to do it our way." ECF No. 77–5, PageID.933. It was then that Officer Korkis reached his hand into the window and the struggle ensued. After this altercation began, but before he was removed from his truck, Plaintiff again stated that he was

going to exit the vehicle voluntarily. ECF No. 77–2, (5:32). Again, he was told by Officer Korkis, "No you're not, you're getting out our way now." *Id.* at (5:33).

Unlike in Defendants' cases, evidence does not show that Plaintiff resisted an order to submit to the arrest, though he resisted plenty of non-arrest related directives. This case is not like *Dunn*, where confusion over a seatbelt created the perception of resistance. Plaintiff affirmed that he would exit his vehicle and was rebuffed more than once. This case is not like *Ryan*, where the driver did not comply with an order to exit their vehicle. Here, no such order was given. And this case is not like *Bozung*, where the driver disobeyed an order to put his hands behind his back. Plaintiff never had the opportunity.

This case is like *Eldridge*, where officers perceived passive resistance based on the failure to produce identification and initiated a forceful and injurious arrest. Other than the potential hand slap that is not visible on video, Plaintiff's "noncompliance was not paired with any signs of verbal hostility or physical resistance, and therefore cannot be deemed active resistance." *Eldridge*, 533 F. App'x at 535. Nonetheless, the only option extended to Plaintiff, despite his offer otherwise, was to be forcefully pulled from his vehicle and taken to the ground. Based on these facts, Defendants chose force when a jury could easily find none was necessary.

The remaining fact that could show active resistance at the time of the arrest,

whether Plaintiff slapped Officer Korkis's hand through the window, must be decided by a jury. Because there remains a genuine issue of fact on this question, a reasonable jury could find that Plaintiff was not resisting and that arresting him with force was objectively unreasonable. *Landis v. Baker,* 297 Fed. Appx 453 (6th Cir. 2008). As such, a reasonable jury could also find that if force was permissible, Defendants' use of force was excessive.

## IV.   CONCLUSION

For the foregoing reasons, Defendants are not entitled to qualified immunity on Plaintiff's remaining claim. Defendants' Motion for Summary Judgment [#77] is **DENIED**.

**IT IS SO ORDERED**.

Dated:  January 5, 2024                    /s/ Gershwin A. Drain
                                           GERSHWIN A. DRAIN
                                           U.S. DISTRICT JUDGE

### CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
January 5, 2024, by electronic and/or ordinary mail.
/s/Lisa Bartlett
Case Manager